# In the United States Court of Federal Claims

BID PROTEST
No. 19-332C
(Filed Under Seal: July 15, 2019 | Reissued: July 29, 2019)*

|  |  |  |
|---|---|---|
| MISSION1ST GROUP, INC., | ) | Keywords: Bid Protest; IDIQ; U.S. Army; |
|  | ) | Cost Realism Analysis; FAR 15.404-1; |
|  | ) | Probable Cost Adjustment; Clarification; |
| Plaintiff, | ) | Clerical Error |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| THE UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Defendant, | ) |  |
|  | ) |  |

*Justin A. Chiarodo*, Blank Rome LLP, Washington, DC, for Plaintiff. *Adam Proujansky* and *Stephanie Harden*, Blank Rome LLP, Washington, DC, Of Counsel.

*Matthew Roche*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General. *Cathleen Higgins Perry*, Chief, Business Law Division A, Army Materiel Command Legal Center, Aberdeen Proving Ground, MD, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff Mission1st Group, Inc. ("Mission1st") brings this post-award bid protest to challenge a decision by the United States Army Contracting Command – Aberdeen Proving Ground ("the Army" or "the agency"), which deemed Mission1st ineligible for award of a Responsive Strategic Sourcing for Services ("RS3") IDIQ contract. Mission1st contends: (1) that it was arbitrary and capricious for the Army to find it ineligible for award based on an inconsistency between its cost narrative and its cost proposal; and (2) that the Army abused its

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. All offeror-specific labor rate and pricing information has been redacted, as noted in brackets, for this public version. In addition, the names of three unsuccessful offerors have been replaced with Offeror A, Offeror B, and Offeror C.

discretion by failing to seek clarification of the inconsistency, which Mission1st characterizes as a mere clerical error.

For the reasons that follow, the Court concludes that Mission1st's arguments lack merit. Accordingly, Mission1st's motion for judgment on the administrative record is **DENIED** and the government's cross-motion is **GRANTED**.

## BACKGROUND

### I.     The Solicitation

#### A.     <u>Overview</u>

The Army issued Solicitation No. W15P7T-15-R-0008 ("the Solicitation") on March 25, 2015. Admin. R. ("AR") Tab 3 at 242 (conformed Solicitation). The Solicitation anticipated the award of multiple IDIQ contracts to provide agency "customers, other Program Executive Offices[,] other Department of Defense [] agencies, and other federal agencies with knowledge based support services for requirements with Command, Control, Communications, Computers, Intelligence, Surveillance, and Reconnaissance (C4ISR) related needs." Id. at 250.

The ceiling amount on the contract was $37.4 billion, including a five-year base ordering period and an option period extending another five years. Id. at 244, 248. The Army would award contracts to "the offerors whose corporate experience proposals [were] rated acceptable and who represent[ed] the best value after a tradeoff analysis in accordance with FAR 15.101-1 of the past performance proposals and total evaluated costs." Id. at 362. The Solicitation provided that past performance was more important than total evaluated cost. Id.

#### B.     <u>Cost Proposal Requirements</u>

Under the Solicitation, offerors were required to use a spreadsheet that the Army supplied as Attachment 1 to format their cost proposals. See id. at 352. Offerors were to propose direct labor rates, indirect expenses, and fees for the base and optional ordering periods, covering three sample labor categories. Id.; see also AR Tab 4 at 366–68 (Attachment 1 of the Solicitation).[1] In addition, the Solicitation required offerors to "submit a cost narrative with sufficient documentation necessary to adequately support and explain the costs proposed." AR Tab 3 at 353.

Particularly relevant to the present protest, the Solicitation cautioned that both the direct labor rates and indirect expense rates listed in the cost narrative and supporting documentation "should exactly match the [] rates in the proposal." Id. at 353–54. If the rates did not match, the

---

[1] The sample labor categories were Program Manager, Computer Systems Analyst/Technician, and Electrical Engineer, Intermediate. AR Tab 3 at 352; AR Tab 4 at 366–68.

offeror was required to "provide adequate detail explaining how the proposed [] rates [were] realistic." Id.

### C. Cost Evaluation

The Solicitation provided that the total evaluated cost used in the award determination would be the total proposed cost that the offeror set forth in Attachment 1, subject to cost realism adjustments. Id. at 365. The contracting officer ("CO") would evaluate the realism of proposed costs "in accordance with FAR 15.404-1(d) and/or (c)." Id. In calculating the government's probable cost, the Army was permitted to "adjust[] (for purposes of evaluation only) an offeror[']s proposed costs, when appropriate, to reflect any additions or reductions to realistic levels based on the results of the cost realism analysis." Id. Additionally, if an offeror did not provide the required documentation for proposed costs, the Army "reserve[d] the right to adjust the proposed rates for purposes of evaluation and cost realism." Id.

Under the terms of the Solicitation, where the proposed cost did not equal the government's probable cost, the probable cost would be used to rank the offeror's proposal. Id. The probable cost would then be considered as the total evaluated cost in conducting the trade-off analysis. Id.

### D. Evaluation and Award Process

The Solicitation provided that contracts could be awarded in two phases. During Phase 1, the Army would consider for award only offerors who had, among other things, proposed costs for the sample labor categories that were "fair, reasonable, and realistic." Id. at 363. The fee amount during Phase 1 would be capped at 7% (or 12% for experimental, developmental, or research work). Id.

If the Army was unable to award a sufficient number of contracts during Phase 1, "proposals that d[id] not meet the criteria for award in Phase 1 [could] be considered for award in Phase 2." Id. No new or amended solicitation was to be issued during Phase 2. Id. Instead, proposal revisions would be accepted as the result of discussions held in accordance with FAR 15.306(d). Id.

## II. The Army Finds Mission1st's Phase 1 Proposal Noncompliant

The Army conducted Phase 1 of the procurement between March 25, 2015 and May 16, 2017. AR Tab 42 at 841. A total of 388 offerors submitted proposals and the Army made fifty-six awards. Id.

Mission1st submitted its proposal for consideration on May 6, 2015. See AR Tab 25 at 559. In a May 16, 2017 Phase 2 discussion letter, the CO informed Mission1st that it had not been awarded a contract during Phase 1. AR Tab 14 at 401. The CO explained that the Army had found Mission1st's proposal noncompliant with the Solicitation's requirements because Mission1st's cost proposal was not submitted in the required format. Id. at 404. Specifically, Mission1st had not submitted the proposal on Attachment 1, had not provided "separate fully burdened rates for each labor category as required," and had proposed costs that were "based on multiple hours and/or full-time equivalents, rather than hourly rates." Id.

The CO instructed Mission1st that if it wished to be considered for award in Phase 2, it should "carefully review" the discussion questions and "submit a revised proposal addressing the items identified by the Government." Id. at 401. The CO warned that during Phase 2, "[p]roposals with an omission or unclear or uncertain proposals may not be considered for award." Id. at 402. She also advised that the agency intended "to make award without discussions after receipt of revised proposals" but that it "reserve[d] the right to conduct clarifications in accordance with FAR 15.306(a) or further discussions in accordance with FAR 15.306(d)." Id.

III.    **Mission1st's Revised Proposal Is Found Noncompliant During Phase 2**

The Army sent Phase 2 discussion letters to a total of 331 offerors. AR Tab 42 at 841. Of these, 298 offerors—including Mission1st—submitted timely revised proposals. Id.

During Phase 2, the Army "used a two standard deviation analysis in establishing a floor for cost realism and price reasonableness." Id. at 854 (discussing the methodology employed for small business offerors); id. at 891 (applying the same methodology for large business offerors). It verified "the calculation of the proposed [cost plus fixed fee—'CPFF'] for each Phase 2 eligible [] offeror" and determined that "[t]he CPFF for each offeror eligible for award [was] above the floor established by two standard deviations below the mean of all offerors in the normal distribution, thereby presenting a realistic proposed CPFF." Id. at 854, 892. Between all offerors (i.e., small and large business offerors), the total evaluated costs for Phase 2 ranged from $299.99 to $948.66. Id. at 892.[2]

One hundred of the 298 offerors evaluated during Phase 2, including Mission1st, were found ineligible for award because they did not meet the minimum requirements of the Solicitation. Id. at 842–44. With respect to Mission1st, its cost submission was again found noncompliant. The Army concluded that it could not "validate the proposed fixed fee because the calculation of proposed (O/H) costs [was] not in accordance with the application of O/H rates disclosed in the supporting documentation." AR Tab 41 at 833 (Mission1st Phase 2 cost evaluation). Specifically, Mission1st had stated in its cost narrative that it would determine overhead costs by applying a fixed percentage to a base that consisted of the applicable direct labor rate and cost of fringe benefits. See id. at 837. Attachment 1, on the other hand, reflected that the overhead costs would be calculated upon the application of the same fixed percentage, but to a base that included only the applicable direct labor rate, and not the cost of fringe benefits. Id.

The CO's rationale is contained in an evaluation notice that the Army drafted for the purpose of "track[ing] and identify[ing] the aspects of the Phase 2 proposal that are not compliant with solicitation requirements." Id. at 831–32. The notice states that Mission1st's proposal did not "comply with its disclosure statement." Id. at 837. It explained that:

_____

[2] The range for eligible large business offerors was larger than the range for eligible small business offerors. The total evaluated costs for the latter group ranged from $307.22 to $798.80. AR Tab 42 at 854.

Mission1st did not edit the formula for calculating overhead (O/H) costs to comply with its disclosure information in the supporting documentation, or the correct formula in the Phase 1 cost proposal. In the revised Phase 2 cost proposal, the O/H is applied to an allocation base of direct labor only:

(O/H Cost = Direct Labor x O/H Rate)

However, the cost narrative on page 2 states, "This OH rate is applied to direct labor <u>and fringe expense</u>," and the historical data in the supporting documentation also demonstrates that the O/H allocation base includes direct labor costs plus applicable fringe:

(O/H Rate = Total O/H Expenses ÷ (Direct Labor + Applicable Fringe)[].

<u>Id.</u> at 837 (emphasis supplied).

In short, the Army found a discrepancy between the formula that Mission1st had employed in Attachment 1 and the one described in Mission1st's cost narrative and supporting documentation. Had Mission1st applied the formula described in its narrative, it would have reflected an overhead cost of $[***] on its spreadsheet, rather than $[***] (indicated in the table below), thereby increasing the amount of Mission1st's total cost proposal by 2%. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 10, ECF No. 18 (citing AR Tab 33 at 682).

| | E | F | G |
|---|---|---|---|
| 8 | **Electrical Engineer, Intermediate** | | |
| 9 | **Cost Element** | **Rate** | **Dollars** |
| 10 | Direct Labor | | |
| 11 | Electrical Engineer, Intermediate | | |
| 12 | Subtotal Direct Labor | | |
| 13 | Indirect Expenses | | |
| 14 | Fringe | | |
| 15 | Overhead | | |
| 16 | | | |
| 17 | Subtotal Indirect Expenses | | |
| 18 | Subtotal Cost | | |
| 19 | G&A | | |
| 20 | Total Cost Input | | |
| 21 | Fee (NON experimental, developmental, research work) | | |
| 22 | **Total (NON experimental, developmental, research)** | | |

<u>Id.</u>

## IV.    The Debriefing

The Army issued its Phase 2 source selection decision on October 2, 2018. AR Tab 42 at 838. Mission1st requested a debriefing on October 22, 2018. AR Tab 1 at 7. That debriefing was held on October 24, 2018. AR Tab 43 at 987–1011 (debriefing presentation).

5

During the debriefing, Mission1st was advised that because of the inconsistencies described above, its cost proposal was "not compliant with Solicitation requirements." AR Tab 43 at 1008 (using the same language contained in the draft evaluation notice). As a result, the agency characterized the total evaluated cost of Mission1st's proposal as "Undetermined." Id. It explained that it was "unable to determine the probable cost" and that "Mission1st's proposal [was] ineligible for award." Id. at 1009.

## V.     Post-Debriefing Questions and Answers

After the debriefing presentation, Mission1st submitted several additional questions regarding the evaluation of its proposal. See AR Tab 44 at 1012–16. The Army submitted its responses to these questions on October 31, 2018. Id. at 1012.

In its responses, the Army explained that the calculations in Mission1st's cost proposal could not be verified "[b]ecause the formula for calculating O/H cost in your cost proposal does not match your disclosed accounting practices." Id. at 1014. "Without a verified cost breakdown," the Army advised Mission1st, "the Government could not determine a Total Proposed Cost or complete its cost realism analysis, and, by extension, could not determine a probable cost." Id.

The Army also rejected Mission1st's suggestion that the error that the Army had identified was immaterial or not "statistically significant" because "[i]f the O/H formula stated in the cost narrative was applied to the Cost Proposal dated 061417, [the] total proposed cost would have increased . . . from $[***] to $[***], a less than 2% difference." Id. at 1015. The Army responded that it "could not verify [Mission1st's] Total Proposed Cost based on [the] Phase 2 cost proposal file submission" and that it was "not required to guess whether the total proposed cost might have increased by 2% or some other potentially larger number due to the error in the formula." Id. The agency also observed that it was "significant that Mission1[st] was unable to convey in its proposal a correct formula." Id.

## VI.     GAO Protest

Mission1st filed a protest with the Government Accountability Office ("GAO") on November 5, 2018. AR Tab 1 at 1. It contended that the agency's evaluation "deviated from well-settled regulations and principles in cost-type procurements like this one, and imposed a draconian standard nowhere found in the Solicitation to exclude Mission1st's highly-rated and competitively-priced proposal based on a minor—and readily identifiable—clerical error that had no meaningful impact on Mission1st's probable overall cost." Id. It argued that its proposal contained "all the information necessary to perform the cost realism analysis the Agency was required to undertake" and that the Army "should [] have addressed the minor clerical error through clarifications." Id.

Relatedly, Mission1st contended that the agency violated the terms of the Solicitation by not completing a cost realism analysis of its proposal. Id. at 2. To the extent that the Army had identified "an unrealistic or flawed overhead calculation," Mission1st argued, the Army was required to make a probable cost adjustment. Id. Its failure to do so, according to Mission1st, rendered its cost realism analysis "incomplete and improper." Id.

GAO denied Mission1st's protest on February 12, 2019. AR Tab 49 at 1044. It found that "the agency reasonably concluded that a cost realism analysis could not be performed, and therefore was unable to determine the proposal's most probable cost." Id. at 1047. GAO concluded that the error in Mission1st's proposal would have required the Army to "choose between one of the two conflicting methods for calculating overhead, and then assume that the method it selected was the one Mission1st intended to use." Id. at 1048. GAO noted, however, that it was incumbent upon Mission1st "to submit a well-written proposal" and that the agency was "not required to infer which of the two methods Mission1st intended to use to calculate its overhead costs." Id.; see also id. at 1049 ("Mission1st failed in its responsibility to submit a well-written proposal, and that failure is what prevented the Army from performing a cost realism analysis."). GAO also observed that even though the agency drafted an evaluation notice addressing the error, "there was nothing in the draft EN to suggest that the agency knew which of the two methods Mission1st intended to use to calculate its overhead costs." Id. at 1049. Likewise, GAO found that the Army was not required to seek clarification from Mission1st regarding the error and that its decision not to do so was not unreasonable. Id. at 1050.

## VII.   The Present Action

Mission1st filed the present bid protest on March 4, 2019. ECF No. 1. In its complaint, Mission1st presses essentially the same arguments that it made to GAO. Mission1st contends that the Army violated the terms of the Solicitation when it rejected Mission1st's proposal based on what it characterizes as essentially a clerical error. See Compl. ¶¶ 50–66. It also argues that the Army's failure to seek clarification was an abuse of discretion. See id. ¶¶ 69–77.

After the administrative record was filed on March 20, 2019, Mission1st filed its MJAR on April 5, 2019. See generally Pl.'s MJAR. The government filed its opposition to Mission1st's MJAR and a cross-motion for judgment on the administrative record on April 24, 2019. See generally Def.'s Cross-Mot. for J. upon the Admin. R. & Resp. to Pl.'s Mot. for J. upon the Admin. R. ("Def.'s MJAR"), ECF No. 21. The cross-motions have been fully briefed. ECF Nos. 24, 28. Oral argument was held on June 11, 2019.

During oral argument, the government advised that—contrary to representations made in its filings—during Phase 2 the Army had issued eight clarification requests to other offerors. June 11, 2019 Hr'g ("Hr'g") at 3:27:20–50; Pl.'s Mot. to Complete the Admin. R. & Suppl. Mem. in Supp. of its Mot. for J. upon the Admin. R. ("Mot. to Complete AR") at 2, ECF No. 31 (stating documents show that agency conducted clarifications for eight proposals). Counsel for Mission1st requested copies of these requests and the opportunity to move for their inclusion in the administrative record. Hr'g at 3:32:55–37:20. The Court issued a scheduling order the same day, directing the government to produce the documents by June 12, 2019. ECF No. 30. On June 18, 2019, Mission1st filed a motion to complete the administrative record and a supplemental brief addressing the new documents. See generally Mot. to Complete AR. The government responded to these filings on July 2, 2019. ECF No. 34.

**DISCUSSION**

I.     **Bid Protest Jurisdiction**

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12 (codified at 28 U.S.C. § 1491(b)). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

A party invoking this Court's bid protest jurisdiction "bears the burden of establishing [the] elements [of standing]." Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)) (alterations in original). To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An actual or prospective offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers, 275 F.3d at 1370 (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (quoting Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131 & n.9 (Fed. Cir. 2008) (citing Lujan, 504 U.S. at 561); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 695–96 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

Mission1st was an actual offeror in this procurement. It contends that the Army's decision to reject its cost proposal and/or its decision not to request clarification of the discrepancy between that proposal and the cost narrative was arbitrary and capricious. Taking the allegations of error in the complaint to be true—as it must to determine standing—the Court

finds that, had the Army requested clarifications and/or not rejected the proposal based on the discrepancy, there is a substantial chance that Mission1st would have been awarded an IDIQ contract. Accordingly, Mission1st is an interested party and the Court has subject-matter jurisdiction over its claim.

## II.  Standard of Review

Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). As a result, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). The Court's function is therefore limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

In short, a disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa, 238 F.3d at 1338. For the agency to

prevail, it need only articulate "a rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43 (quotation marks and citations omitted).

## III.   Merits

Mission1st presents two interrelated grounds for its protest. First, it argues that the Army acted arbitrarily when it failed to complete a cost realism analysis of Mission1st's proposal. Specifically, it contends that the Army should have recognized that the calculation of overhead costs Mission1st supplied in Attachment 1 was the product of clerical error. <u>See, e.g.</u>, Pl.'s MJAR at 30. It contends further that the Army should have corrected Mission1st's error by making a probable cost adjustment to the proposal. <u>See, e.g.</u>, <u>id.</u> at 20–21. It characterizes its error as "minor" and "immaterial," and argues that the Army overlooked similar errors, inconsistencies, and omissions contained in other offerors' proposals. <u>Id.</u> at 27–29. Alternatively, Mission1st contends that it was an abuse of discretion for the Army not to seek clarification regarding the discrepancy between the overhead costs set forth in Mission1st's revised cost proposal and the method of calculating overhead costs set forth in its cost narrative. <u>See id.</u> at 29–31.

For the reasons set forth below, the Court concludes that Mission1st's contentions are without merit.

### A.   <u>Mission1st's Claim That the Army's Decision Not To Make a Probable Cost Adjustment to Its Proposal Was Arbitrary and Capricious</u>

As noted, Mission1st claims that the Army acted arbitrarily when it rejected Mission1st's proposal based on the discrepancy between (1) the method for calculating overhead costs described in its cost narrative and supporting documentation, and (2) the method that it employed to calculate those costs in its cost proposal (i.e., in Attachment 1). It contends that the rejection of its proposal on this basis was inconsistent with the terms of the Solicitation and with FAR 15.404-1(d)(2), which it claims required the Army to make probable cost adjustments to reconcile the cost proposal with the narrative and supporting documentation as part of its cost realism analysis.

FAR 15.404-1(d)(2) provides that "cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror."[3] "Probable cost" reflects "the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal," and is used for purposes of evaluation to determine best value. FAR. 15.404-1(d)(2)(i). It is determined "by adjusting each offeror's proposed cost,

---

[3] Cost realism analysis is "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." FAR. 15.404-1(d)(1).

and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." FAR 15.404-1(d)(2)(ii).

In Mission1st's view, it should have been obvious to the Army: (1) that the formulas Mission1st inserted to calculate overhead costs in the Attachment 1 spreadsheet were the product of an inadvertent error; and (2) that Mission1st intended to propose costs consistent with the formula described in the cost narrative. Further, according to Mission1st, the Army could have—and should have—made a probable cost adjustment to Mission1st's cost proposal because the agency had all the information it needed to adjust the costs to comport with the formula prescribed in the cost narrative (i.e., it knew Mission1st's proposed direct labor, fringe, overhead, G&A, and fee rates). "All the Army needed to do to get the correct amount for O/H Cost," Mission1st contends, "was to add the Fringe number to the Direct Labor number before multiplying by the O/H rate . . . [which was] plainly addressed in Mission1st's cost proposal narrative." Pl.'s MJAR at 24. Mission1st asserts that "[t]his is precisely the sort of probable cost adjustment that is contemplated by the FAR provision governing the required [cost] realism analysis." Id.

Mission1st's assertions are unpersuasive. It is well established that contracting agencies have broad discretion regarding the "nature and extent" of a cost realism analysis, "unless the agency commits itself to a particular methodology in a solicitation." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009). "Where, as here, the solicitation does not set forth a particular methodology for the cost realism analysis, the agency 'enjoy[s] broad discretion' in conducting it." McConnell Jones Lanier & Murphy LLP v. United States, 128 Fed. Cl. 218, 236 (2016) (quoting Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011)) (alteration in original). Accordingly, "the court's scope of review of an agency's cost realism determination is very narrow." Id.; see also CTA Inc. v. United States, 44 Fed. Cl. 684, 693 (1999) ("Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis.").

Mission1st's contention—that it was irrational for the agency not to correct the calculation of overhead cost contained in the cost proposal as part of its cost realism analysis—lacks merit. For one thing, nothing in the Solicitation or the FAR requires an agency to make a probable cost adjustment when performing a cost realism analysis. To the contrary, the Solicitation uses permissive language with respect to probable cost adjustments, stating that "[t]he Government probable cost may be determined by adjusting (for purposes of evaluation only) an offeror[']s proposed costs, when appropriate, to reflect additions or reductions to realistic levels." AR Tab 3 at 365 (emphasis supplied). Similarly, the Army merely "reserve[d] the right" to "adjust the proposed rates" where "an offeror d[id] not provide the required supporting documentation"; it did not obligate itself to do so. Id.

Further, and more importantly, the Army faced a threshold problem when it undertook its cost realism analysis of Mission1st's cost proposal during Phase 2. It could not be certain precisely what Mission1st was proposing with respect to its indirect expenses and fee. Nor could it verify those cost elements because the proposal itself, as submitted, did not conform to the cost narrative and supporting documentation. A probable cost adjustment is not a vehicle for resolving uncertainties regarding an offeror's intent. It is a vehicle for adjusting either upwards

or downwards the costs that the agency understands the offeror to have proposed so that those proposed costs reflect the government's best estimate of the likely actual costs of the proposal.[4]

The Court is also unpersuaded by Mission1st's argument that the Army had to have known that Mission1st intended overhead costs to be calculated based on the methodology set forth in the cost narrative, and not on the basis of the formulas used in the spreadsheets. To the contrary, there were two ways the agency might reasonably have interpreted the discrepancies in Mission1st's proposal. First, it might have concluded—as Mission1st argues—that Mission1st personnel committed an inadvertent error when they entered the formulas for overhead costs on the spreadsheet. But that was not the only possible interpretation of Mission1st's intent. Alternatively, the Army might reasonably have expected that Mission1st would have exercised particular care in preparing the spreadsheet, given that it had been disqualified from receiving an award during Phase 1 based in part on its failure to use the proper format in presenting its cost proposal. The agency might further have found it significant that the revised formula had to be entered manually for each of the six separate labor categories, one by one, making it less likely that an inadvertent error had been made in the cost proposal. The agency might have instead reasonably concluded that the error was in a failure to modify the cost narrative used during Phase 1.

The Court is unpersuaded by Mission1st's reliance on the language of the draft evaluation notice the Army prepared to provide evidence that the Army in fact somehow <u>knew</u> that the overhead costs set forth in Attachment 1 were the product of inadvertent error. Describing the content of Attachment 1, the notice stated that "Mission1st did not edit the formula for calculating overhead (O/H) costs to comply with its disclosure information in the supporting documentation, or the correct formula in the Phase 1 cost proposal." Pl.'s MJAR at 23 (citing AR Tab 63 at 2992 (draft EN for Mission1st's Phase 2 proposal)). This language merely explains how the discrepancy occurred, reflecting the Army's recognition that in Attachment 1 Mission1st had used a formula for calculating overhead costs that did not comply with the formula described in its cost narrative and used in its Phase 1 cost proposal. The EN does not purport to draw conclusions about what Mission1st intended.

It is axiomatic that the burden is on the offeror "to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency."

---

[4] Mission1st cites <u>United Payors & United Providers Health Servs., Inc. v. United States</u>, 55 Fed. Cl. 323, 331 (2003) and <u>Priority One Servs., Inc.</u>, B-288836, 2002 CPD ¶ 79 (Comp. Gen. Dec. 17, 2001), for the proposition that "[w]here an agency fails to make any attempt to adjust offerors' proposed cost or to develop most probable costs estimates based on the offerors' technical approaches, the agency has acted unreasonably." <u>See</u> Pl.'s MJAR at 25 (internal quotations and alteration omitted). These cases, however, are inapposite. Neither involved circumstances where—as in this case—the agency could not be sure what costs the offeror intended to propose. Instead, in these cases, the cost proposals themselves were clear; the question was whether the agencies had an obligation to make an adjustment where they knew that certain assumptions underlying the cost proposals were inaccurate.

Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 744 (2009); see also KSC Boss Alliance, LLC v. United States, 142 Fed. Cl. 368, 382 (2019); Harmonia Holdings Grp., LLC v. United States, 136 Fed. Cl. 298, 308 (2018); Mercom, Inc. v. United States, 131 Fed. Cl. 32, 40 (2017); Westech Int'l, Inc. v. United States, 73 Fed. Cl. 272, 296 (2007). And the bottom line is that the agency had no way of knowing for sure why the cost narrative and cost proposal were inconsistent with one another. It was not irrational or unreasonable for the agency to decline to choose which of the two cost proposals (or perhaps some third alternative) reflected Mission1st's actual intent.

In fact, the Solicitation required that cost proposals be consistent with the cost narrative and supporting documentation and stated that the Army's proposal evaluation "will be limited to the information provided and nothing will be assumed." AR Tab 3 at 353–54, 362. Further, the discussion letter sent to Mission1st reinforced these requirements, warning that unlike in Phase 1, "[p]roposals with an omission or unclear or uncertain proposals may not be considered for award" during Phase 2. AR Tab 14 at 402.

The Court also rejects Mission1st's argument that its cost proposal was not materially noncompliant with the Solicitation because the difference between the total costs set forth in its cost proposal and those that would have been derived from the methodology set forth in its cost narrative was a relatively small one (2%). An error is material if it "(1) violates an express provision of the [solicitation] and (2) the [solicitation] provision violated serves a substantive purpose in the evaluation process." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 508 (2019). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." Id. at 506. Here, Mission1st's proposal violated express provisions of the Solicitation requiring that its cost proposal be consistent with its cost narrative. Further, its error had a cascading effect that prevented the agency from verifying a number of cost elements, including Mission1st's proposed fee. See Bus. Integra, Inc. v. United States, 116 Fed. Cl. 328, 335 (2014) (failure to include a required price was "material, not because of the dollar amount of the error," which would have amounted to only .0041% of the total value of the proposal, "but because the price information was important to the government's evaluation of the offer").

Finally, the Court notes that Mission1st's briefs include claims that the cost realism analysis process the Army employed with respect to all of the proposals before it was a "sham" because, among other things, the Army ultimately did not make probable cost adjustments to any of the proposals submitted, and because it deemed realistic and reasonable any proposed costs that were within two standard deviations below or above the mean cost of the proposals. Pl.'s MJAR at 20. The result of these standards, Mission1st argues, was that all of the cost proposals were found reasonable and realistic, including two that were actually above the cutoff. Id.

The Court declines to consider these claims because Mission1st lacks standing to assert them. The Army's use of a more rigorous cost realism analysis would not have changed the outcome of the procurement for Mission1st. It was found ineligible for award because, as a result of the conflicting information in its submission, its proposed costs could not be determined and verified. Because it was reasonable for the agency to disqualify Mission1st on that basis, the Court declines to consider its other broader contentions.

**B.**     **Mission1st Was Not Subject to Disparate Treatment**

Mission1st contends that the Army subjected it to unfair or unequal treatment when it declined to correct Mission1st's proposal while it performed what Mission1st calls "de facto probable cost adjustments" of five other cost proposals that allegedly contained similar errors or omissions. Id. at 27–28. It is well established that treating like cases in an unequal fashion is a hallmark of arbitrary decision-making. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 490 (2013) ("[A] contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.") (internal quotation marks omitted); PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004) (noting that "uneven treatment goes against the standard of equality and fair-play" required in the procurement process). Mission1st's unequal-treatment contention is unpersuasive, however, because the five examples of proposals where the Army allegedly overlooked or corrected proposal mistakes are readily distinguishable from Mission1st's proposal.

The first example of alleged unequal treatment is based on the Army's handling of Fibertek's proposal. In its cost narrative, Fibertek proposed that its "option period direct labor rates [would be] escalated by [***]% annually for five years over the base period direct labor rates." AR Tab 63 at 3427 (Fibertek Phase 2 cost evaluation). The Army concluded that when it applied this methodology, it resulted in a labor rate of $[***] for the Electrical Engineer, Intermediate direct labor category. Def.'s MJAR at 30–31. Fibertek's proposal, however, supplied a direct labor rate of $[***]. AR Tab 63 at 3427. In brief, the government attributes the two-cent disparity to a difference in the methods that Fibertek and the government used when rounding the numbers that resulted from the application of the [***]% annual escalator. Def.'s MJAR at 31.

Unlike this case, the Army did not conclude that Fibertek's direct labor rate was inconsistent with its supporting documentation. The Army also did not conclude that the $[***] rate was an error; it merely noted the discrepancy in passing, finding that it was not material. There were no other discrepancies between the formulas set forth in Fibertek's cost narrative and the calculation of its costs. Further, the agency did not adjust Fibertek's proposal to reflect the $[***] rate and the two-cent difference had no effect on any of the cost elements.

The other examples of errors or omissions that Mission1st cites are also distinguishable from the error contained in Mission1st's proposal. For example, Karthik Consulting's ("Karthik") error was to not include direct labor <u>hourly</u> rates in its supporting documentation; instead it provided payroll records that included <u>annual</u> salary amounts. AR Tab 63 at 3627. This omission was immaterial, however, because when the agency divided the annual salaries provided by 2,080 hours/year "the reflected hourly rates exactly match[ed] the direct labor rates in the proposal for the base period, and the option period after escalation [was] applied." Id. The Army was able to overlook the omission precisely because, unlike Mission1st's proposal, the supporting documentation in Karthik's proposal (specifically the annual salary contained in the payroll records) was consistent with its cost proposal.[5]

_____

[5] The cost evaluation for Karthik erroneously states that "the Government probable cost for direct labor is Undetermined." AR Tab 63 at 3627. As the Army explains, this language was

Another similar example cited by Mission1st concerns the evaluation of a proposal by offeror ACET. During its Phase 2 evaluation, the Army noted that "ACET's proposed costs in its Excel spreadsheet included (as required) a direct <u>hourly</u> labor rate for the Electrical Engineer Intermediate labor category, but the supporting documentation only provided an <u>annual</u> rate at the [***] percentile." Def.'s MJAR at 37; <u>see also</u> AR Tab 63 at 3134. The Army was nonetheless able to verify the consistency of the rates in the cost proposal, as it had for Karthik, by "dividing the salary amount at the [***] percentile by 2080" to confirm that "the hourly rate exactly matche[d] the direct labor rate in the proposal." AR Tab 63 at 3134.

Likewise, during the Phase 2 cost evaluation the Army found that the direct labor rates in the proposal submitted by InteliTrac did not exactly match the direct labor rates set forth in the supporting documentation. AR Tab 63 at 3575. Specifically, the proposed hourly rates were equivalent to hourly rates that were within the [***] quartile range from the Bureau of Labor Statistics. <u>Id.</u> at 3574. The rates supplied in the supporting documentation were at the [***] and [***] quartile ranges. <u>Id.</u> at 3575. As with Karthik's proposal, the Army was able to validate the consistency of the supporting documentation and the cost proposal through simple arithmetic— i.e., by "adding the hourly mean ([***] percentile) wage with the hourly rate at the [***] percentile, and then dividing by two." <u>Id.</u>[6]

Mission1st's final example of alleged disparate treatment concerns the Army's evaluation of a proposal by offeror Glacier Technologies ("Glacier"). Glacier's cost narrative stated that "its base period direct labor rates are 'based on the DOL [Department of Labor] [***] rate by metropolitan area tables ([***]) using [***].'" AR Tab 63 at 3478 (Glacier Technologies Phase 2 evaluation quoting proposal's text). Glacier's supporting documentation also included rates within the [***] and [***] percentile ranges from that salary data. <u>Id.</u>; Def.'s MJAR at 38. Glacier, however, did not "provide direct labor rates in its supporting documentation." AR Tab 63 at 3478. Nonetheless, the Army was again able to use arithmetic to verify the consistency of the direct labor rates by "multiplying the proposed base period direct labor rates by 2,080/year" to confirm that "the proposed annual salaries fall very near the middle of the [***] and [***] percentile range." <u>Id.</u>

In short, the five examples upon which Mission1st relies are inapposite. Better analogies to the treatment of Mission1st's proposal may be found in other proposals that the Army rejected for essentially identical reasons, including those submitted by Offeror A and Offeror B. Like Mission1st, Offeror A's proposal was rejected when its fee could not be verified because "the calculation of the proposed indirect costs [was] not in accordance with the application of

---

contained in the evaluation of Karthik's Phase 1 proposal and should have been—but was not— deleted from the Phase 2 cost evaluation. Def.'s MJAR at 32.

[6] The Army also stated that "InteliTrac provides salary surveys without all of the information as required in the solicitation - there is no job description for the Electrical Engineer, Intermediate labor category." AR Tab 63 at 3574. As with Karthik, the Army states that this was an error with InteliTrac's Phase 1 evaluation which, though resolved, was erroneously included in the Phase 2 evaluation. Def.'s MJAR at 35; <u>see</u> AR Tab 63 at 3578–79 (InteliTrac resolved Phase 1 cost evaluation notices).

Overhead (O/H) and General & Administrative (G&A) rates disclosed in the supporting documentation." AR Tab 63 at 2860 (Offeror A Phase 2 cost evaluation); see also id. at 2865 (draft EN using language essentially identical to that used in draft EN for Mission1st proposal). Similarly, the Army rejected Offeror B's proposal because it could not determine its fee, in part because "the calculation of indirect costs (O/H) in the option period is not in accordance with the application of O/H rates disclosed in the supporting documentation." Id. at 2950 (describing that the Army could not calculate direct labor rates for Offeror B); see also AR Tab 63 at 3017 (evaluation characterizing Offeror C's cost as "undetermined" because "calculation of proposed overhead (O/H) costs is not in accordance with the application of O/H rates disclosed in the supporting documentation"); id. at 3022–23 (Offeror C Phase 2 draft EN #2-1).[7]

As is readily apparent, the difference between Mission1st's proposal and the five examples it cites is that resolving the apparent omissions or discrepancies in the examples did not require the Army to make subjective judgments about the intent of the offerors, as did the discrepancies in the proposals of Mission1st, Offeror A, and Offeror B. In Mission1st's case, it is undisputed that the cost narrative and the cost proposal are irreconcilable. In the case of the five examples at issue, on the other hand, the cost realism of the figures contained in the cost proposals could be verified by reference to the supporting documentation. In no instance did the Army do for the other offerors what Mission1st states it was required to do for it—change the numbers contained in its cost proposal. The Court, accordingly, rejects Mission1st's disparate treatment claim.

## C.   The Army Was Not Required To Seek Clarification of Mission1st's Proposal

FAR 15.306(a)(2) provides that when contract awards are made without discussions, "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." Mission1st contends that its error was "minor, obvious, and immaterial" and so the Army should have requested clarification of the discrepancy between its cost narrative and cost proposal. Pl.'s MJAR at 30. The Court finds these arguments unpersuasive.

Clarifications are "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a)(1). The decision whether to request clarifications lies within the discretion of the CO. ST Net, Inc. v. United States, 112 Fed. Cl. 99, 109–10 (2013) ("This court has repeatedly recognized the permissive nature of [FAR 15.306] in the context of negotiated procurements.") (collecting cases). Notwithstanding the discretionary nature of a CO's decision not to seek clarifications, this court has stopped short of finding that such a decision is categorically exempt from judicial review.

---

[7] After mistakenly applying the overhead rate to an allocation base of direct labor only in its Phase 1 proposal, Offeror B made a correction during Phase 2. Its revised proposal was nonetheless rejected because Offeror B "corrected [its] calculation of O/H costs in the base period, but not in the option period." AR Tab 63 at 2953. Therefore, "[i]n the option period the O/H rate is applied only to direct labor and not to associated fringe benefit costs" without an explanation for the discrepancy. Id.

See BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 512 (2013) (refusing to "accept the implication that there are never situations in which a contracting officer's discretion would be abused by a failure to seek clarification"). Nonetheless, the standard of review of such determinations is highly deferential, requiring a showing that the CO's decision was irrational.

As the court of appeals has observed, clarifications "are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 998 (Fed. Cir. 2018) (quoting JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 661 (2002)). It is therefore always reasonable for a CO not to request clarifications of a proposal that is materially deficient.

In this case, as explained above, Mission1st's proposal was noncompliant with requirements critical to the Army's evaluation process—for example, the instruction to "submit a cost narrative with sufficient documentation necessary to adequately support and explain the costs proposed." AR Tab 3 at 353. Further, and again contrary to the Solicitation, Mission1st's indirect expense rates did not exactly match its supporting documentation and it did not "provide adequate detail explaining how the proposed indirect expense rates are realistic." Id. at 353–54.

The CO's decision not to request clarifications was also reasonable because such clarifications "may not provide new information or alter already provided information." ManTech, 141 Fed. Cl. at 507. Correcting the errors in Mission1st's cost proposal would result in the material alteration of a number of its cost elements, starting with the overhead costs and cascading down to the proposed fee.

Moreover, "a critical component of evaluating a CO's decision to not seek clarification is whether the CO should have discerned that the protestor made an error rather than a deliberate decision." Criterion Sys., Inc. v. United States, 140 Fed. Cl. 29, 37 (2018). In this case, for the reasons set forth above, the CO had no way of knowing from the face of Mission1st's proposal whether it was the cost narrative or the formulas used in the cost proposal that were incorrect. The errors were therefore substantive, not clerical, in nature. See ManTech, 141 Fed. Cl. at 507 ("Obvious, clerical errors regarding prices exist when 'the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal.'") (quoting DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 545 (2007)); see also Slater Elec. Co., Dec. B–183654, 75–2 CPD ¶ 126, 1975 WL 8122 (Comp. Gen. Aug. 26, 1975) (failure to submit price for item in bid can be corrected "if the bid, as submitted, indicates not only the probability of error but also the exact nature of the error and the amount intended").

The Army's decision not to request clarifications is also supported by the posture of the procurement in this case. The Army had originally anticipated receiving fifty proposals in response to the Solicitation, Def.'s Reply in Supp. of its Cross-Mot. for J. Upon the Admin. R. at 19, ECF No. 28 (citing AR Tab 3 at 362), but it ultimately received 388, AR Tab 42 at 841. The evaluations were conducted in two phases. There were 198 offerors in Phase 2 whose proposals met the award criteria, including 148 small businesses. AR Tab 42 at 845. The Army held rounds of discussions with offerors whose proposals were found deficient during Phase 1. See, e.g., AR Tab 14 at 401–04 (May 16, 2017 discussion letter to Mission1st). Mission1st itself participated in those discussions and was provided an opportunity to correct its initial deficient cost proposal. Id.

17

The source selection authority decided not to engage in another round of discussions during Phase 2 because the high number of awardees ensured enough technical skillsets and competition at the task order level. AR Tab 42 at 843. Under these circumstances, it was hardly irrational for the Army to decide that it would not be worthwhile to allow Mission1st (along with other similarly situated offerors) yet another opportunity to make themselves eligible for an award by giving them an opportunity to explain discrepancies in their proposals. Cf. ST Net, 112 Fed. Cl. at 111 n.23 (decision not to engage in further communications where proposals did not include essential price or brand name information was "consistent with the FAR's general goal of conducting acquisitions in an efficient manner" where solicitation "prompted the submission of over 240 proposals from more than 140 bidders," and where agency had "repeatedly warned offerors of the importance of submitting complete and accurate information").

At the oral argument in this case, the government acknowledged that—contrary to the statements in its brief that no clarifications were requested during Phase 2—the agency in fact requested clarifications as to eight proposals. Mission1st's motion to include these eight requests in the record is **GRANTED**. But the requests do not assist Mission1st's case because each one involved an obvious typographical error. None affected the overall cost of the proposals or required a material alteration to their terms.

Six of the eight clarifications involved typographical errors in the CAGE or DUNS code listings. See, e.g., AR 4181, ECF No. 31-1 (clarifying whether CAGE code "3VYS0" in examples 2 and 3 of volume 2 should have been "3VSY0"); id. at 4182 (clarifying whether CAGE code "4G307" in the cover letter should have been "4GE07"); AR 4183 (clarifying whether DUNS number "22549914" in example 2 of volume 2 and "0225499914" in example 3 of volume 2 should have been "022549914"); id. at 4184 (clarifying whether CAGE code "OEUA6" in the cover letter should have been "0EUA6"). In each of these instances, the agency verified the correct identifiers using information from a government-wide source (the System for Award Management or "SAM"). Def.'s Resp. to Pl.'s Mot. to Complete the Admin. R. & Resp. to Pl.'s Suppl. Mem. in Supp. of its Mot. for J. upon the Admin. R. at 4, ECF No. 34. As for the remaining two clarifications, the government verified correct task order numbers based on its review of the Past Performance Information Retrieval System ("PPIRS"). Id.; see also AR 4184–85 (clarifying whether task order "TO 005" under Period of Performance should have been "052"); id. at 4185–86 (clarifying whether "H98230-13-C-1375, Subcontract TM-IDIQ-CCT 470001753, Order PO 500125335" in example 2 of volume 1 and "H98230-13-C-1375, Subcontract TM-IDIQ-CCT 470001753, Order Number PO 7500125335" in example 2 of volume 2 referred to the same contract).

Unlike Mission1st's error, where the agency had no way of knowing which overheard formula was correct, all eight of the clarifications involved minor typographical errors, which the Army verified using information at its disposal. Furthermore, none of the clarifications required the agency to alter material terms of the proposal, such as price. If the agency verified that the formula in Mission1st's narrative was correct, it would then have needed to recalculate Mission1st's total proposed cost. This is precisely the type of proposal revision that cannot be done through clarification. See Dell Fed. Sys., L.P., 906 F.3d at 998; ManTech, 141 Fed. Cl. at 507. Mission1st's reliance on these examples to demonstrate that the agency arbitrarily failed to request clarifications of its proposal is therefore unavailing.

## CONCLUSION

For the foregoing reasons, Mission1st's motion to complete the administrative record (ECF No. 31) is **GRANTED**. Mission1st's motion for judgment on the administrative record (ECF No. 18) is **DENIED** and the government's cross-motion for judgment on the administrative record (ECF No. 21) is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge